Cara Leslie ALEXANDER,
et al., Plaintiffs,

v.

FEDERAL BUREAU OF
INVESTIGATION, et
al., Defendants.

Nos. CIV. 96–2123, CIV. 97–1288.

United States District Court,
District of Columbia.

March 29, 2000.

Larry Klayman, Washington, D.C., for Plaintiffs.

David W. Odgen, Acting Assistant Attorney, Anne L. Weismann, James J. Gilligan, Elizabeth Shapiro, U.S. Dept. of Justice, Washington D.C., for EOP & FBI.

David E. Kendall, Marcie Ziegler, Williams & Connolly, Washington, DC, for Hillary Rodham Clinton.

## MEMORANDUM AND ORDER

LAMBERTH, District Judge.

This matter comes before the court on Plaintiffs' Motion [827] to Compel Answers to Plaintiffs' First Set of Interrogatories to the Executive Office of the President Pursuant to Court Order of April 13, 1998. Upon consideration of this motion, and the opposition and reply thereto, the court will GRANT the plaintiffs' motion.

## I. *Background*

The underlying allegations in this case arise from what has become popularly known

as "Filegate." Plaintiffs allege that their privacy interests were violated when the FBI improperly handed over to the White House hundreds of FBI files of former political appointees and government employees from the Reagan and Bush Administrations.

This particular dispute revolves around interrogatories pertaining to Mike McCurry, Ann Lewis, Rahm Emanuel, Sidney Blumenthal and Bruce Lindsey. Plaintiffs served these interrogatories pertaining to these five current or former officials on May 13, 1999. The EOP responded on July 16, 1999. Plaintiffs now seek to compel further answers to the following lines of questioning:

1. Any and all knowledge these officials have, including any meetings held or other communications made, about the obtaining of the FBI files of former White House Travel Office employees Billy Ray Dale, John Dreylinger, Barney Brasseux, Ralph Maughan, Robert Van Eimerren, and John McSweeney (Interrogatories 11, 35, 40 and 47).

2. Any and all knowledge these officials have, including any meetings held or other communications made, about the release or use of any documents between Kathleen Willey and President Clinton or his aides, or documents relating to telephone calls or visits between Willey and the President or his aides (Interrogatories 15, 37, and 42).

3. All meetings held or other communications made, including all communications made to the media, related to the use or obtaining of FBI background investigation files, summary reports, or raw data on persons included on the FBI files list (Interrogatories 34, 39, and 46).

4. Any and all communications these officials have had relating to release or use of information from Linda Tripp's Department of Defense files (Interrogatory 41).

5. Any and all communications and/or meetings these officials have had with Cody Shearer (Interrogatory 52).

The EOP responded in its opposition to the plaintiffs' motion that the only information it withheld based on its objections was information regarding the release of Kathleen Willey's letters to the President. For this information, the EOP asserts the attorney-client, work-product, and deliberative process privileges. As to the remaining questions, the EOP states that they were answered fully and completely. Plaintiffs argue, however, that they are entitled to receive the EOP's assurances under oath that information has not been withheld. They further argue that they are entitled to the information regarding the release of the Willey letters.

II. *Analysis*

"Parties may obtain discovery regarding any matter not privileged, which is relevant to the subject matter involved in the pending action." FED.R.CIV.P. 26(b). The information sought by the plaintiffs is clearly relevant to the pending action. Once a showing of relevance has been made by the party seeking discovery, the party objecting to that discovery bears the burden of "show[ing] why discovery should not be permitted." *Corrigan v. Methodist Hosp.*, 158 F.R.D. 54, 56 (E.D.Pa.1994) (citing *Amcast Indus. Corp. v. Detrex Corp.*, 138 F.R.D. 115, 118 (N.D.Ind.1991)); *see also Ellsworth Assocs., Inc. v. United States*, 917 F.Supp. 841, 844 (D.D.C.1996) ("A party opposing discovery bears the burden of showing why discovery should be denied.") With this in mind, the court will first address those interrogatories that the EOP claims were answered fully.

A. *Interrogatories the EOP claims were answered fully*

For the great majority of the questions, the EOP has not even attempted to establish why discovery should not be granted. Instead, the EOP states in its opposition that no information was withheld for these questions. They assert that the objections made were for protective purposes only, and the

five individuals in fact responded fully to the interrogatories, without regard to the EOP's objections. Therefore, the EOP argues, the plaintiffs' motion is moot with respect to these questions.

Plaintiffs, however, request that the EOP's assertions that no information has been withheld be submitted to them under oath.[1] Rule 33(b) of the Federal Rules of Civil Procedure requires that "[e]ach interrogatory shall be answered separately and fully in writing and under oath." Plaintiffs are clearly entitled to have the complete answers to their interrogatories made under oath. Thus, the assertions made by the EOP, which modify their original answers to state in effect that their objections are withdrawn and that the information given was in fact complete, must also be made under oath. Accordingly, for those questions for which the EOP now asserts that no information was withheld, the EOP must provide the plaintiffs with verified supplemental responses incorporating these assertions under oath. The court will now turn its analysis to those interrogatories for which the EOP continues to assert privileges.

### B. *Interrogatories regarding the Willey letters*

■ The EOP acknowledges that information was withheld in response to those interrogatories concerning Bruce Lindsey's knowledge, discussions and communications regarding the release or use of documents from Kathleen Willey (Interrogatories 15, 37 and 42).[2] The answers provided by Bruce Lindsey to these interrogatories included an objection to the extent they seek "to discover the substance of deliberations between members of the Counsel's Office, on the basis of the deliberative process privilege, the attorney-client privilege, and the work-product doctrine." EOP Responses at 22. "It is settled law that the party claiming the privilege bears the burden of proving that the communications are protected." *In re Lind-*

*sey*, 158 F.3d 1263, 1270 (D.C.Cir.1998). In order to satisfy this burden, the EOP provided to the court a declaration by former Counsel to the President, Charles F.C. Ruff. This declaration addresses the discussions held among lawyers in the White House Counsel's Office regarding the release of the Willey letters. The EOP also filed, in response to this court's order of March 13, 2000, a declaration by Lindsey for the court's *in camera* and *ex parte* review. This declaration gave a slightly more detailed description of Lindsey's knowledge concerning the Willey letters and their release. Having considered these declarations, the court will now turn its analysis to the EOP's assertion of the attorney-client privilege.

#### 1. *Attorney-client privilege*

##### a. *Elements of the attorney-client privilege*

■ As this court has previously stated, the attorney-client privilege applies when: (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion of law or (ii) legal services or (iii) assistance in some legal proceeding, and (d) not for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client. *Alexander v. FBI*, 192 F.R.D. 42, 45 n. 2 (D.D.C.2000); *Alexander v. FBI*, 186 F.R.D. 154, 161 (D.D.C.1999) (citing *In re Sealed Case*, 737 F.2d 94, 98–99 (D.C.Cir.1984)). In addition, where, as in this case, the communications at issue are made by attorneys, those communications are shielded only "if they rest on confidential information obtained

---

1. The plaintiffs did in fact withdraw their request to compel further answers to interrogatories 3 and 53 after Bruce Lindsey provided the plaintiffs with a verified supplemental response stating that no information had been withheld.

2. The answers provided by Sidney Blumenthal and Rahm Emanuel asserted several objections on various grounds of privilege. The EOP now states that no information was withheld with regard to those individuals. As discussed above, however, the plaintiffs are entitled to receive this information under oath.

from the client." *In re Sealed Case*, 737 F.2d 94, 99 (quoting *Mead Data Central, Inc. v. United States Dep't of Air Force*, 566 F.2d 242, 254 (D.C.Cir.1977)). The attorney-client privilege, therefore, does not protect an attorney's opinion or advice, but only "the secrecy of the underlying facts" obtained from the client. *Mead*, 566 F.2d at 254 n. 28.

▌ Plaintiffs argue that the discussions at issue are not privileged because there is no evidence that they involved any confidential information obtained by the client. As the claimant of the privilege, the EOP must demonstrate with "reasonable certainty . . . that the lawyer's communication rested in significant and inseparable part on the client's confidential disclosure." *In re Sealed Case*, 737 F.2d at 99 (citation omitted). This court recognizes that, in practice, it is often hard to separate lawyer's advice to a client from that client's confidential communications. *See id.* ("[A]dvice prompted by the client's disclosures may be further and inseparably informed by other knowledge and encounters."); *In re Ampicillin Antitrust Litigation*, 81 F.R.D. 377, 388 n. 20 (D.D.C.1978) ("[I]n practice it is generally impossible to separate [communications from client to attorney] from the ones made by the attorney to the client.") In this instance, however, the EOP has failed to show that the communication at issue was based in any way, even in some small part, on a confidential communication from the client. *See In re Sealed Case*, 737 F.2d at 99.

Most of the discussions at issue did not involve the client[3] at all, but rather took place only between the attorneys, Ms. Mills, Mr. Lindsey and Mr. Ruff. *See* Charles F.C. Ruff Declaration at 2.[4] The EOP does not offer any evidence, either in Charles Ruff's Declaration or in their *ex parte, in camera* submission, that these discussions involved confidential communications received from either the EOP or the President. In its

opposition, the EOP states that the discussions related to confidential facts received from the EOP, and cites as evidence one of its responses to the plaintiffs' interrogatories.

This response describes how the Clinton White House Counsel's Office became aware of the letters. *See* EOP Opposition at 22. It states in part that in 1997, after Lindsey heard from Linda Tripp that Willey had made accusations about the President, Lindsey told White House aide Nancy Hernreich. *See id.* Hernreich then gave Lindsey some of the Willey letters.[5] *See id.* Thereafter, prior to the airing of Willey's "60 Minutes" interview, the White House received a transcript of that interview. *See id.* That weekend, Lindsey, Mills and Ruff had their discussions about whether the letters should be released. *See id.*

This response, however, does not provide any evidence that the discussions at issue involved any confidential information received from the EOP or the President. According to this response, the only information obtained from the client were the Willey letters themselves, which were obtained from the EOP. These letters, however, are clearly not confidential facts as they were publicly released. Furthermore, these letters originally came not from the client, but from Kathleen Willey. Therefore, the EOP has not met its burden of establishing that the information withheld pertained to a confidential communication from the client.

### b. *Crime—Fraud Exception*

▌ Furthermore, even if the court were to find that the EOP had sufficiently established that the discussions at issue are protected by the attorney-client privilege, the crime-fraud exception would apply. Communications otherwise protected by privilege are not protected if they "are made in furtherance of a crime, fraud, or other miscon-

---

3. The client in this instance is "both the Executive Office of the President and the President in his official capacity." Charles F.C. Ruff Declaration at 2.

4. One discussion, during which the White House Counsel's Office communicated their final recommendation to the President, did involve a client, the President.

5. As discussed below, the remaining Willey letters were gathered the morning after the "60 Minutes" aired by the Office of Records Management ("ORM"), pursuant to a request from Ms. Mills (or someone at her direction). See EOP Responses at 23.

duct." *In re Sealed Case,* 754 F.2d 395, 399 (D.C.Cir.1985). "[T]he party seeking to overcome the privilege [has] the burden of showing that the crime-fraud exception applie[s]." *In re Sealed Case,* 107 F.3d 46, 49 (D.C.Cir.1996). In order to meet this burden, the party "need not prove the existence of a crime or fraud beyond a reasonable doubt." *In re Sealed Case,* 754 F.2d at 399. Instead, the party must offer "evidence that if believed by the trier of fact would establish the elements of an ongoing or imminent crime or fraud." *Id.; In re Sealed Case,* 107 F.3d at 50. The party claiming the exception must then also show that "the client[6] consult[ed] the lawyer for the purpose of committing a crime or fraud." *In re Sealed Case,* 107 F.3d at 51.

### (i) *Privacy Act violation*

■ This court finds that the plaintiffs have presented facts that establish the elements of a criminal violation of the Privacy Act. In order to establish a claim under the Privacy Act, a party "must prove that: (1) the agency 'disclosed' information; (2) the information 'disclosed' is a 'record' contained within a 'system of records'; (3) an adverse impact resulted from the disclosure; and (4) the agency's disclosure was willful or intentional." *Barry v. United States Dep't of Justice,* 63 F.Supp.2d 25, 27 (D.D.C.1999); *see also* 5 U.S.C. § 552a.

■ The EOP does not dispute that the Kathleen Willey letters were disclosed.[7] The EOP also does not dispute that an adverse impact resulted from the disclosure. Therefore, the court will now turn its analysis to the remaining two elements.

### (a) The letters were "records" contained within a "system of records."

A record is defined by the Privacy Act as "any item, collection, or grouping of information about an individual that is maintained by an agency, including, but not limited to, his education, financial transactions, medical history, and criminal or employment history and that contains his .name...." 5 U.S.C. § 552a(a)(4). "The D.C. Circuit examined this definition in *Tobey v. N.L.R.B.,* 40 F.3d 469 (1994), and concluded that to qualify as a record the information must (1) contain the individual's name or other identifying particular and (2) be 'about' the individual." *Fisher v. National Insts. of Health,* 934 F.Supp. 464, 468 (D.D.C.1996).

The information at issue clearly contains, and was retrieved by using, Kathleen Willey's name. The EOP states in its responses to the plaintiffs' interrogatories, that:

> [t]he Monday morning after the "60 Minutes" [with Kathleen Willey] aired (March 16, 1998), Ms. Mills, or someone at her direction, requested that the Office of Records Management ("ORM") gather any additional correspondence from Ms. Willey. ORM gathered all the correspondence in their records and provided it to Ms. Mills that morning. Shortly thereafter, the letters were made available to the press.

EOP Responses at 23. Terry Good, the Director of the ORM, testified at his deposition in this case that the ORM, after receiving this request, retrieved the Willey letters by entering Kathleen Willey's name into the ORM's database. *See* Tr. Of the Deposition

---

6. The EOP argues that the crime-fraud exception could not apply because the "client" must have committed the crime or fraud, and the client in this case, the EOP, could not have committed the alleged crime—a Privacy Act violation—because the criminal provision of the Act only applies to individual agency employees. There is no strict requirement that the client have committed the crime, however, as the D.C. Circuit has stated that there are cases, though rare, that the exception is applied despite the client's innocence. *See In re Sealed Case,* 107 F.3d at 49. Regardless, the EOP's argument overlooks the fact that, as Ruff stated in his declaration, the client in this case is both the EOP and the President. *See* Ruff Declaration at 2. The EOP admits that when Mr.

Lindsey called the President to advise him of the recommendation to release the letters, "[t]he President concurred in that recommendation." EOP Responses at 23. In addition, Bruce Lindsey could also be considered to have violated the act as an individual agency employee, as he "occupies a dual position as an Assistant to the President and a Deputy White House Counsel." *In re Lindsey,* 158 F.3d at 1277.

7. The EOP has argued in the past that it is not an "agency" subject to the Privacy Act, but this court rejected this argument earlier in this case. *See Alexander v. FBI,* 971 F.Supp. 603, 605–06 (D.D.C.1997).

of Terry Good at 257 ("Good Tr.") (June 30, 1998) ("In the course of doing a response to the counsel's office, we would have [entered Ms. Willey's name for a search on our database], yes.") Therefore, the information at issue clearly contained Willey's name and was retrieved by using that name.

The Willey letters are also clearly "about" Kathleen Willey. In *Tobey,* the D.C. Circuit holds that the information in the record need not " 'reflect some quality or characteristic' of the individual involved . . . [s]o long as the information is 'about' [that] individual." *Id.* at 472. This court finds that the information in these letters are "about" Kathleen Willy, as they clearly pertain to her, the events of her life, and her relationship with the President. The letters do not merely contain her name incidentally or for some collateral purpose, but rather focus on her and the President. *See id.* (rejecting as too narrow the Third Circuit's holding that information constitutes a record as long as that information is in some way "linked with an identifying particular (or itself was an identifying particular).")

The EOP argues that "even if plaintiffs establish that the letters constitute 'records' under the Privacy Act, plaintiffs have not shown that they were kept in a 'system of records' as that term is defined by the Act." EOP Opposition at 26–27. This court disagrees. The D.C. Circuit looked at what constitutes a "system of records" under the Act in *Henke v. United States Dep't of Commerce,* 83 F.3d 1453 (C.A.D.C.1996). In *Henke,* the Court of Appeals first recognized that there is a distinction between a group of records and a system of records. *Id.* at 1459. The Court then set out the standard for determining if a group of records constitutes a system under the Act, stating that "in determining whether an agency maintains a system of records keyed to individuals, the court should view the entirety of the situation, including the agency's function, the purpose for which the information was gathered, and the agency's actual retrieval practice and policies." *Id.* at 1461. The Court of Appeals further explained:

[t]hus, as in [this] case . . ., where information about individuals is being gathered as an administrative adjunct to a grant—making program which focuses on businesses and where the agency has presented evidence that it has no practice of retrieving information keyed to individuals, the agency should not be viewed as maintaining a system of records. On the other hand, where an agency—such as the FBI—is compiling information about individuals primarily for investigative purposes, Privacy Act concerns are at their zenith, and if there is evidence of even a few retrievals of information keyed to individuals' names it may well be the case that the agency is maintaining a system of records.

*Id.*

In this case, the White House has gathered information for a variety of reasons, including for investigatory purposes related to its employees.[8] The particular information at issue in the current dispute was gathered for the purpose of publicly discrediting Ms. Willey in light of her accusations against the President.

More importantly, however, the plaintiffs in this case have presented evidence not only of several specific retrievals by individual names, but also evidence that such retrievals are done regularly in the normal and ordinary course of business. Terry Good, Director of the ORM, testified at his deposition that not only was the information at issue retrieved by using Kathleen Willey's name, documents pertaining to Monica Lewinsky and Linda Tripp were also retrieved by using those individuals' names. *See* Good Tr. at 284 ("Q: When you did the search for documents, you searched by her name Monica Lewinsky? A: That's correct."); *id.* at 277 ("Q: To find that information in documents Linda Tripp's name would have been entered into your database? A: That's correct.")

Good further testified that such searches and retrievals of documents were part of the agency's normal practice. *See* Good Tr. at 277 (testimony of Good that the search and retrieval of documents regarding Linda

---

8. Information from FBI files, for which the D.C. Circuit expressed particular concern, are includ-

ed in these records, although the information at issue here was not part of an FBI file.

Tripp was performed "in the normal course of handling that kind of request."); *see also id.* at 50 (testimony of Good that the ORM regularly abstracted any sensitive information so that the information could be included in their responses "to any member of the White House staff who asks for information on that subject *or that person.*" (emphasis added)). Good further explained what "usually" takes place:

> [White House] counsel's office ... sends out a memo to the staff saying, please search your files for the following documents or information or people, whatever. We will go through our computer database and key in those names of people or organizations or subjects or what have you. Any hits we get, we will then follow up and look at the documents that those abstracts relate to or those inventories.

Good Tr. at 328–29. Given this testimony, it is clear that it is the White House's regular practice to retrieve information about individuals by reference to their names. *See Henke*, 83 F.3d at 1461 ("[I]f there is evidence that an agency in practice retrieves information about individuals by reference to their names, the mere fact that the agency has not acknowledged that it operates a system of records will not protect it from the statutory consequences of its actions.")[9] Thus, considering the entirety of the situation, including the purpose for which the information was gathered and the ordinary retrieval practices and procedures of the White House, this court finds that the plaintiffs have sufficiently established that the information at issue is a "record" contained within "system of records."[10]

**(b) The disclosure was willful or intentional.**

The EOP also argues that the plaintiffs can not establish the requisite intent. As noted above, in order to constitute a criminal violation of the Privacy Act, the agency official must have disclosed the information "knowing that disclosure of the specific material is so prohibited." 5 U.S.C. § 552a(i)(1). This court, however, finds that the plaintiffs have met their burden of establishing that the President acted willfully or intentionally.

The EOP maintains that the President did not act willfully because the Department of Justice has, in the past, taken the position that the White House Office is not subject to the Privacy Act. This court, however, has already rejected this argument in this same case and explicitly held that the White House Office and its various component agencies are subject to the Privacy Act. *See Alexander v. FBI*, 971 F.Supp. at 605–06. Furthermore, this decision was issued nine months *prior* to the President's decision to release the Willey letters.[11] Therefore, when the President and the EOP released the letters, they were fully aware of this court's ruling that the Privacy Act was applicable, and that disclosure of the letters was therefore prohibited by the Privacy Act.[12]

9. The White House Office has not published notices of systems of records as required by the Privacy Act. *See* 5 U.S.C. § 552a(e)(4); EOP's Combined Reply Memorandum in Support of its Motion for a Protective Order and Opposition to Plaintiffs' Motion to Compel Further Deposition Testimony of Terry W. Good at 23.

10. It would be an entirely different issue if the disputed letters were strictly personal letters to the President, maintained privately by him. This court notes that it is unclear whether such letters would nevertheless be covered by the Presidential Records Act. Regardless, however, there is no legal argument in this case that the Willey letters should be considered personal letters, since they became part of the central White House records and were retrieved by the officials responsible for these records by entering Kathleen Willey's name into the main database.

11. The court's decision holding that, despite the Department of Justice's position, the EOP was in fact subject to the Privacy Act was issued on June 12, 1997. *See Alexander v. FBI*, 971 F.Supp. 603 (D.D.C.1997). The Willey letters were released in March of 1998.

12. The EOP further argues that this Court found that the Department and the EOP's position was at least a reasonable one, given that it certified the issue for appeal to the D.C. Circuit. *See Alexander v. FBI*, Civ. No. 96–2123, Order at 1 (August 12, 1997). This court is puzzled by this argument, however. The D.C. Circuit declined to accept the issue for appeal, and therefore, it has expressed no opinion on this issue. This court simply does not understand why the EOP and the President, without any judicial decision to support their position, determined that they were free to directly disregard this court's prior decision in the pending case. This court cannot accept or condone this unlawful action.

Additionally, as further evidence that the White House and the President were aware that they are subject to the Privacy Act, the plaintiffs point to an internal White House memorandum, dated June 30, 1993, which was sent to John Podesta, then Assistant to the President and Staff Secretary. *See* Transcript of the Deposition of Bernard Nussbaum at 288–89 (June 4, 1999). This memorandum states that the contents of the attached records, which consist of the Official Personnel Folders of seven White House travel office personnel, "are covered by the Privacy Act of 1974, have restricted use and should be protected carefully." *Id.* Given this evidence, the court finds that the plaintiffs have sufficiently established that the White House and President were aware that they were subject to the Privacy Act, and yet chose to violate its provisions. Thus, the plaintiffs have established that the President had the requisite intent for committing a criminal violation of the Privacy Act.

### (ii) *The lawyers were consulted for the purpose of violating the Privacy Act.*

Having offered sufficient evidence to establish each of the elements of a criminal Privacy Act violation, the plaintiffs must also show that "the client consult[ed] the lawyer for the purpose of committing a crime or fraud." *In re Sealed Case,* 107 F.3d at 51. The purpose of the crime-fraud exception is "to assure that the 'seal of secrecy' between lawyer and client does not extend to communications made for the purpose of getting advice for the commission of a fraud or crime." *United States v. Zolin,* 491 U.S. 554, 562, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989) (citations omitted). As discussed above, the release of the Willey letters was a criminal

violation of the Privacy Act. The EOP admits that, in the context of representing the EOP and the President in his official capacity, the senior lawyers of the White House Counsel's office discussed whether these letters should be released and ultimately recommended their release to the President. *See* EOP Responses at 23; Ruff Declaration at 2. The EOP further admits that "the President concurred in this recommendation." EOP Responses at 23. Therefore, the discussions regarding the release of the Willey letters, even if initially protected by the attorney-client privilege, fall squarely within the crime-fraud exception to this privilege. Therefore, the court rejects the EOP's claim of attorney-client privilege.

### 2. *Work-product privilege*

█ Given the court's finding that the crime-fraud exception applies, the court need not address the EOP's work-product claim. It is well established that the crime-fraud exception also applies to the work-product privilege. *See In re Sealed Case,* 676 F.2d 793, 811 n. 67 (D.C.Cir.1982) ("Every circuit which has considered the question has held or assumed that the crime-fraud exception applies to the work product privilege.") In fact, "[t]he majority of cases addressing the crime-fraud issue have dealt specifically with the work product privilege." *In re Sealed Case,* 754 F.2d at 400. Just like with the attorney-client privilege, "an attorney's opinion work product cannot be privileged if the work was performed in the furtherance of a crime, fraud or other type of misconduct." *Id.* at 812. Therefore, once a sufficient showing of a crime has been made, as it has here, "the privilege[13] vanishes as to all material

---

13. It is questionable that the work-product privilege would apply to the discussions at issue, even without considering the crime-fraud exception. This court has previously addressed in this case the test for determining the viability of a work-product privilege claim as to intangible work product. This court stated that the test is "whether, in light of the nature of the intangible work product and the factual situation in the particular case, the information can fairly be said to have been prepared or obtained because of the prospect of litigation." *Alexander v. FBI,* 192 F.R.D. 12, 17 (D.D.C.2000) (quoting *Senate of Puerto Rico v. United States Dep't of Justice,* 823

F.2d 574, 587 n. 42 (D.C.Cir.1987)). Charles Ruff's Declaration, which the EOP provides to support their privilege claim, states that the discussions were conducted in anticipation of impeachment proceedings against the President. Ruff Declaration at 2. However, in *In re Lindsey,* 158 F.3d 1263, 1277 (D.C.Cir.1998), the D.C. Circuit stated "that impeachment is fundamentally a political exercise." The Court of Appeals further stated that "[i]n preparing for the eventuality of impeachment proceedings, a White House Counsel in effect serves the President as a political advisor, albeit one with legal expertise." *Id.* The Court of Appeals then held that "informa-

related to the ongoing violation." *Id.* Therefore, the court rejects the EOP's claim of work-product privilege.

### 3. *Deliberative process privilege*

 Finally, the EOP claims that the information plaintiffs seek is protected by the deliberative process privilege. The deliberative process privilege is "predicated on the recognition that the quality of administrative decision-making would be seriously undermined if agencies were forced to operate in a fish bowl." *Dow Jones & Co. v. Department of Justice,* 917 F.2d 571, 573 (D.C.Cir.1990)(quotation omitted). Thus, in order for the privilege to apply, the information sought must be predecisional and deliberative. *See Access Reports v. Department of Justice,* 926 F.2d 1192, 1194 (D.C.Cir. 1991).

 However, as this court has already noted in this case "[t]he Court of Appeals has made clear that the deliberative process privilege 'disappears altogether when there is any reason to believe government misconduct occurred.' " *Alexander v. FBI,* 186 F.R.D. 170, 177 (D.D.C.1999) (quoting *In re Sealed Case,* 121 F.3d 729, 746 (D.C.Cir. 1997)). Therefore, in light of the court's finding above that the plaintiffs have established that the President committed a criminal violation of the Privacy Act, the court rejects the EOP's claim of deliberative process privilege.[14] *See Alexander,* 186 F.R.D. at 177 ("If there is any reason to believe the information sought may shed light on government misconduct, public policy (as embodied by the law) demands that the misconduct not be shielded merely because it happens to be predecisional and deliberative.") Having

tion gathered in preparation for impeachment proceedings and conversations regarding strategy" were thus not protected by the attorney-client privilege. *Id.* Therefore, such conversations, including those that the plaintiffs seek, would presumably not be covered by the attorney work-product privilege either, as there is no prospect of "litigation".

14. Again, even without considering the misconduct exception, it appears that the deliberative process privilege would not be applicable in this case. The Court of Appeals has held that the deliberative process privilege "does not apply when a cause of action is directed at the govern-

thus rejected all of the EOP's privilege claims, the court will now compel the EOP to answer the plaintiffs' interrogatories regarding Bruce Lindsey's knowledge about the release and use of the Willey letters.

### III. *Conclusion*

For the reasons stated above, the court HEREBY ORDERS that Plaintiffs' Motion [827] to Compel Answers to Plaintiffs' First Set of Interrogatories to the EOP Pursuant to Court Order of April 13, 1998 is GRANTED. The EOP shall, within 20 days of this date, provide answers to the plaintiffs' interrogatories, as discussed in this opinion.

SO ORDERED.

ment's intent." *In re Subpoena Duces Tecum Served on the Office of the Comptroller of the Currency,* 156 F.3d 1279, 1279 (D.C.Cir.1998). The EOP concedes this, but states that the Court of Appeals has also recognized that the privilege is not defeated when the governmental decision-making is collateral to the plaintiffs' suit. *See id.* Although this may be the law, however, it is inapposite to this case. The government does not deny that it improperly obtained FBI files as the plaintiffs allege, but rather claims it was simply an unintentional mistake. Accordingly, this case clearly turns entirely on the government's intent.