John DOE # 1, John Doe # 2, and John Doe # 3, for and on behalf of themselves and a class of others similarly situated; the Texas Farm Bureau; and the American Farm Bureau Federation, Plaintiffs,

v.

Ann M. VENEMAN, in her official capacity as Secretary of the United States Department of Agriculture; Wildlife Services; Animal and Plant Health Inspection Service; and the United States Department of Agriculture, Defendants,

and

Animal Protection Institute, Intervenor–Defendant.

No. CIV.A.W–99–CA–335.

United States District Court,
W.D. Texas,
Waco Division.

Sept. 30, 2002.

---

Charles Stephen Kelley, Mayer, Brown, Rowe & Maw, Houston, TX, Mark R. Ter Molen, Richard F. Bulger, Mayer, Brown & Platt, Chicago, IL, for Plaintiffs.

Daniel M. Castillo, Asst. U.S. Atty., Austin, TX, for Defendants.

Virginia Brannon, James Tutchton, University of Denver, Forbes House, Denver, CO, for Intervenor-Defendant.

### MEMORANDUM OPINION AND ORDER

WALTER S. SMITH, Jr., District Judge.

Plaintiffs seek relief under the Administrative Procedures Act ("APA"), 5 U.S.C. § 701, et seq., the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and the Privacy Act of 1974 ("Privacy Act"), 5 U.S.C. § 552a. The Federal Defendants have moved to dismiss Plaintiffs' claims, and both Defendants and Plaintiffs have moved for summary judgment. The Intervenor has been provided the opportunity to submit its own briefing in response to the parties' dispositive motions. Having reviewed the motions, the Court is persuaded the Plaintiffs' request for relief is appropriate and that a permanent injunction should issue.

### I. PARTIES

The John Doe Plaintiffs ("Individual Plaintiffs") are ranchers and farmers who have requested or entered into what are known as Cooperative Agreements with the Government through the United States Department of Agriculture's ("USDA") Wildlife Services ("WS") and/or Animal and Plant Health Inspection Service ("APHIS"). The Individual Plaintiffs sought assistance from the Government in controlling damage to livestock from dangerous predators through participation in a program using livestock protection collars ("LPC's"). Plaintiffs Texas Farm Bureau and American Farm Bureau Federation (collectively "Farm Bureau") are not-for-profit general farm organizations which represent the interests of their members.

The USDA is the primary federal agency charged with implementing programs that affect ranchers and farmers, including programs related to the protection of livestock from wildlife damage. APHIS is an entity within the USDA, which is responsible for controlling wildlife damage and helping to protect endangered species. WS is a cooperative program within APHIS that provides assistance to both public and private entities in dealing with wildlife management.

Intervenor Animal Protection Institute ("API") is a nonprofit animal advocacy organization headquartered in Sacramento, California. Its stated purpose is to educate and encourage the public to treat animals humanely, including advocating non-lethal methods to manage conflicts with wildlife.

Forest Guardian ("FG"), although not a party to this action, is involved because an injunction previously entered by this Court was expanded to include a suit filed by the organization in New Mexico. FG is also a nonprofit animal rights group, with a stated mission to protect and restore the native biological diversity and watersheds of the American Southwest and Northern Mexico.

## II.  PROCEDURAL BACKGROUND

In a separate action filed in the District of Columbia, API filed a FOIA suit seeking identifying information regarding participants in the LPC program.  The Plaintiffs initiated the present suit after they learned that the Government intended to release the identifying information in the D.C. lawsuit on a voluntary basis as part of a settlement agreement with API.

After this suit was filed and Plaintiffs requested a temporary restraining order, the parties agreed to the entry of a preliminary injunction which precluded the Government from releasing the identifying information until the Court had ruled on the merits of Plaintiffs' claims.  The Government then filed motions to stay proceedings and to transfer venue to D.C., both of which were denied. The Plaintiffs' subsequent motion to expand the preliminary injunction was granted, and the Government's motion to remand the proceedings to the administrative agency was denied.  The Court further granted the Plaintiffs' motion to certify this as a class action and denied API's motion to intervene.  API appealed, and the Fifth Circuit reversed. As previously noted, all parties, including API, have had an opportunity to file dispositive motions or to respond to the motions filed by others.

## III.  CLAIMS

Plaintiffs' First Amended Complaint includes the following grounds for relief:  (1) the release of personal information would be an arbitrary and capricious exercise of Government authority and an unlawful abuse of agency discretion because the information is exempt from disclosure under Exemption 6 of FOIA (Plaintiffs seeks relief as to both the API and FG suits); (2) the release of personal information would be an arbitrary and capricious exercise of Government authority and an unlawful abuse of agency discretion because the information is exempt from disclosure under exemption 4 of FOIA; (3) the release of personal information would constitute an arbitrary and capricious exercise of Government authority and an unlawful abuse of agency discretion because the information is exempt from disclosure under exemption 3 of FOIA;  (4) the release of personal information would constitute an arbitrary and capricious exercise of Government authority and an unlawful abuse of agency discretion because disclosure of such information is prohibited by the Privacy Act (Plaintiffs seek relief as to both the API and FG suits).

## IV.  FACTUAL BACKGROUND

The background facts are not in dispute:

As previously noted, WS provides assistance to both public and private entities in dealing with wildlife management.  Pursuant to the Animal Damage Control Act ("ADC Act"), 7 U.S.C. §§ 426 and 426b, WS has the authority to assist in solving problems that are created when wildlife causes damage to agricultural, urban, or natural resources.  In the western states, WS has primarily provided assistance in helping to control predation of livestock by coyotes, bears, bobcats and mountain lions. Most WS activities are conducted on private land in response to specific requests for assistance, but WS also provides assistance in resolving some wildlife damage problems on federal and state managed lands as well.  As an example, more than 99% of WS's work in Texas is performed on private property.

The WS program is cooperative in the sense that WS works together with private parties, state governments and other federal agencies to address wildlife damage problems.  The entities WS works with are known as "Cooperators" and share in the costs of WS activities.  Many Cooperators pay the entire bill for WS services. WS defines any individual or entity who

seeks its help to resolve a wildlife problem a Cooperator.

Cooperators document their consent to WS's entry on their property in a written agreement entitled "Agreement for Control of Animal Damage on Private Property" ("Cooperative Agreement"). A separate Cooperative Agreement exists for landowners adjacent to the property of a person who has requested assistance. WS has over 85,000 Cooperative Agreements throughout the United States.

A Cooperative Agreement contains personal information about Cooperators, including, but not limited to, names, addresses, telephone numbers, ranch or farm name, property owner name, property owner address, land class and size, and the number of the Cooperative Agreement. A Cooperative Agreement also contains other information, such as the species of wildlife to be managed, the methods that will be used to do so, and an identification of the type of pesticide to be applied on the property.

WS maintains both paper and computerized records containing information from the Cooperative Agreements. The computer database is referred to as the Management Information System ("MIS"). It identifies all of a WS specialist's activities in a particular week. It is a major management tool for the organization. The MIS "captures" or incorporates the information contained in Cooperative Agreements, including Cooperator names and addresses and other identifying information, such as the county in which a Cooperator is located, the acreage of the Cooperator's property, telephone numbers, agreement numbers and agreement types. Because it is computerized, information may be retrieved from the MIS by Cooperator name or other personal identifiers. While the information in those records is shared with other agencies and organizations, WS does not generally release personal information about Cooperators to the general public.

In some cases, WS uses or recommends lethal techniques to eradicate predators. These may involve the use of products which have been classified as "restricted use pesticides" under the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA"). A "restricted use pesticide" is a hazardous product that requires special storage and use. WS uses approximately 40 restricted use pesticides at various Cooperator locations.

One of the lethal damage control devices provided by WS is the livestock protection collar ("LPC"). The LPC is used to protect sheep and goats in fenced pastures from predators, such as coyotes. The LPC consists of a bladder filled with a 1% solution of Compound 1080 (sodium fluoroacetate) attached to a Velcro™ neck strap, which is then attached to the neck of a sheep or goat. When attacking livestock, coyotes frequently bite the throat where the toxicant-filled rubber bladder is positioned. One advantage of the LPC is that only the predator actually attacking the sheep or goat is killed; others that may not be killing livestock are unaffected. Compound 1080 is a restricted-use pesticide, and WS personnel who use LPC's must be certified through the State pesticide regulatory agency. LPC applicators must follow all label directions and use restrictions set forth by the EPA. LPC's are not used on public land. WS specialists document their application of Compound 1080 on a LPC form termed an Application Data Report.

Another method of lethal predator control is through use of the M–44 sodium cyanide ejector mechanism ("the M–44"). This device works by ejecting sodium cyanide powder into the mouth of a predator when the animal pulls on the baited M–44 unit. The sodium cyanide powder reacts

with the moisture in the animal's mouth, releasing hydrogen cyanide gas. M–44's are placed along game trails, livestock trails, ridges, near seldom-used ranch roads and along fence lines. The devices are used mostly in the winter and spring, but are used year round in some locations. Sodium cyanide is also a restricted use pesticide.

Historically, WS has suffered opposition from animal rights groups, which has escalated over time. WS equipment, offices and vehicles have been vandalized, burglarized, bombed, set on fire and shot at. WS employees have been subjected to physical assaults, bomb threats and death threats. Two WS dogs have been poisoned. Plaintiffs' X10, 11, 12. These acts have occurred in practically every state. In order to protect its employees, WS does not publicize or physically identify its offices. WS employees are concerned that the same acts could be inflicted upon Cooperators if their names and addresses become known.

APHIS has a centralized FOIA and Privacy Act office which responds to requests for information about programs under APHIS's umbrella, including WS. USDA regulations concerning the processing of FOIA requests are codified at 7 C.F.R. Part 1. USDA rules are fully applicable to APHIS and provide the following procedures when a FOIA or Privacy Act request is received:

The request is assigned a case number and referred to the program area involved so that responsive records can be retrieved. If responsive records are found, they are turned over to a FOIA specialist who reviews the record to identify and redact information which is exempt from disclosure. A response is then sent to the requester with the exempt material redacted. If the requester is dissatisfied, s/he may file an appeal. The FOIA office will reconsider its earlier determination. If APHIS recommends that any part of an appeal be denied, the FOIA office then prepares an appeal package that it forwards to the USDA's Office of General Counsel ("OGC") for review. The OGC determines whether the FOIA office's decision should be upheld or reversed. The OGC then instructs the FOIA office how to proceed, and the final determination is sent to the requester. For FOIA lawsuits, APHIS is represented by the Department of Justice.

Requests for Cooperator information have been received by APHIS since the early 1990's. Since that time, the number of requests has increased drastically. The agency's policies regarding disclosure have been somewhat erratic. Prior to the spring of 1998, APHIS withheld personal information about Cooperators under Exemption 6. Identifying information was released only when it was clear from the face of a Cooperative Agreement that it pertained directly to a business organization, such as when the Cooperator or ranch name was modified with an "Inc." or "Co." If no such modification was present, the information would be withheld even in those cases where it was unclear whether an identifier referred to a business organization or an individual, such as when a Cooperator was identified as "John Doe Ranch."

In 1998, a new policy was distributed to USDA agency heads by Kenneth E. Cohen, Assistant General Counsel in the General Law Division of the OGC. Cohen indicated that the USDA's general approach to responding to requests for lists of names and addresses needed to be refined because of unpublished opinions issued by federal district courts in Idaho (*State of Idaho v. United States Forest Service,* Civ. Action No. 97–0230–S–BLW) and California (*Maples v. USDA,* Civil Action No. F 97–5663 SWI DLB). Cohen directed that

names and addresses should be released when they reflected a business capacity, even when the business address is also the home address of the individual concerned. The memo further directed that "business capacity" would include farming, ranching, outfitting and similar activities of a commercial nature.

As a result of the Cohen Memo, APHIS changed the way it responded to FOIA requests seeking personal Cooperator information. Rather than presuming that such information was protected, it was now presumed that any Cooperator was a business entity not afforded a right to privacy. APHIS and WS discussed with OGC the difficulty they had determining from the face of a Cooperative Agreement whether a Cooperator was a business or not. OGC advised APHIS to "make the call" based on the amount of resources (e.g., livestock) to be protected.

WS strongly objected to this interpretation, and the OGC changed its interpretation. It then determined that there is a valid basis to withhold personal Cooperator information under Exemption 6, which policy has apparently not been retracted. Plaintiff's X 7e; X 3, p. 38; X 2, p. 94; X 1, p. 146. Since that time, APHIS seems to have been consistent in withholding personal Cooperator information pursuant to Exemption 6.

In November 1997, API requested Application Data Reports regarding the use of LPC's in every state where the LPC is or has been used. APHIS provided responsive documents to API for California, Utah, Virginia, and West Virginia, but redacted any personal information including ranch names and home addresses pursuant to Exemption 6.

In April 1999, API requested that APHIS perform a second search for LPC documents in Texas and New Mexico. APHIS then provided API with 622 pages of LPC Application Data Reports, from which personal information had again been redacted pursuant to Exemption 6. The information provided by APHIS discloses the following: the date an LPC was applied; the date the LPC was removed; the number of animals collared; the number of livestock losses prior to application of the LPC; the number of coyotes suspected to have been killed by the LPC; the number of coyotes found dead; the date the LPC's were inspected; the number of non-target species found dead or suspected killed; whether collars were missing; whether an accidental release of Compound 1080 occurred; and whether anything unusual occurred, such as harm to humans or domestic animals. Unsatisfied with this information, API filed an administrative appeal of the APHIS decision to redact identifying information. No appeal package was disclosed to the Plaintiffs.

On August 31, 1999, API filed suit in the United States District Court for the District of Columbia, alleging that APHIS had violated FOIA by withholding the identifying information. On behalf of USDA, an attorney with the OGC, Ruth Ann Azeredo, reviewed the record and instructed that the requested information be released to API. The basis for her determination was that the Cooperators were in business, and the service provided by WS was related to their business. She based her decision on the Cohen memo, even though that policy had been withdrawn at the time of her review. Plaintiff's X 17h; X 17g.

After learning of the pending settlement in the D.C. lawsuit, Plaintiffs contacted the government's attorney handling the case who stated that the private information would be released. After no consent to delay release was communicated, Plaintiffs filed the present lawsuit on November 1, 1999. In January 2000, Plaintiffs amended their complaint to add another FOIA request/lawsuit that had been filed in New

Mexico by FG. FG's FOIA request sought "the [WS] management information system database used as the basis for all Wildlife Services annual reports for the states of Arizona, California, Colorado, Idaho, Kansas, Montana, Nebraska, Nevada, New Mexico, North Dakota, Oregon, South Dakota, Texas, Utah, Washington, and Wyoming." Apparently without exhausting administrative procedures, FG filed suit in the U.S. District Court for the District of New Mexico to compel APHIS to disclose the requested information. As with the D.C. suit, APHIS agreed to settle, and released partial records from the MIS. However, APHIS did withhold personal information pursuant to Exemption 6. After entry of the TRO in this case, APHIS disclosed certain records at the instruction of the OGC which did not have personal information redacted.[1] The records released in New Mexico lacked even a single indicator that a business organization was involved, such as "Inc.," "Co.," "Ltd.," or even a generic ranch name. Rather, the records pertained directly to individuals, and included their names, addresses, telephone numbers, property acreage and agreement numbers. Plaintiffs' X 18e; X 5, pp. 53–55. APHIS simultaneously released another 45 pages of records which identified Cooperators by "Ranch Common Name" and Cooperative Agreement number. Plaintiffs' X 18e.

FG and the government agreed to settle the New Mexico suit, with FG agreeing to delete from its request MIS records from non-LPC states and the government agreeing that Exemption 6 would not be used to withhold Personal Information. Plaintiffs' X 5, p. 59, X 18f. After Plaintiffs broadened their complaint to include the FG lawsuit, further action in that suit was stayed.

## V.  DISCUSSION

*A.  Federal Defendants' Motion to Dismiss.* The government moves to dismiss Plaintiffs' claims related to "other pending FOIA requests." The government argues that the Court lacks jurisdiction over these claims because they are not ripe, they are non-final administrative actions, and they do not constitute a Constitutional violation. Having reviewed the parties' briefs in this regard, the Court is persuaded the motion is meritorious and should be granted. Plaintiffs' request for relief in this regard is too broad for the Court to effectively review because such requests are numerous, request a variety of information, and are still pending with administrative agencies. Additionally, it is impossible for the Court to ascertain whether each and every pending request is within the parameters of the claims raised this suit. Suffice it to say, if the USDA, APHIS, WS or any related agency releases personal information in circumstances covered by this Court's Judgment, both the government and any party to whom such information was released would be subject to sanctions by this Court. Finally, as Plaintiffs note in their summary judgment submissions and statement of facts, APHIS has returned to its pre-Cohen policy of withholding personal Cooperator information under Exemption 6. Accordingly, it is

**ORDERED** that the Government's Motion to Dismiss is **GRANTED** as to any FOIA requests not specifically identified in Plaintiffs' First Amended Complaint, which consists of Identification Numbers 98–116 (and any expanded or related requests, including the D.C. lawsuit), and 99–115 (and any expanded or related requests, including the New Mexico lawsuit), and as to all additional claims except for those under FOIA and the Privacy Act.

1. The disclosure of that information was the    subject of a previous motion for sanctions.

*B. Standard of Review.* While Plaintiffs have raised a number of claims, the heart of their complaint is the inappropriateness of the government's proposed release of information under FOIA. Because the Plaintiffs are seeking to halt a proposed release of information under FOIA, the present suit is classified as a "reverse FOIA" action. Such cases are not brought under FOIA, but are cognizable under the Administrative Procedures Act ("APA"). 5 U.S.C. §§ 701–706. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979). *See also, Campaign for Family Farms v. Glickman*, 200 F.3d 1180, 1184 (8th Cir.2000) ("FOIA, as solely a disclosure statute, only provides a cause of action to compel disclosure, but not an action to prohibit disclosure"). Therefore, to prevail in a reverse FOIA suit, the Plaintiff must prove that the agency's decision to disclose was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Merely establishing that the information may fall within a FOIA exemption is insufficient, because the exemptions "are no more than their description implies." *Family Farms*, 200 F.3d at 1185. In other words, if information falls within an exemption, no party can require disclosure. However, if information falls within an exemption, the agency is not prohibited from making a disclosure. *Id.* "Normally, then, an agency has discretion to disclose information within a FOIA exemption, unless something independent of FOIA prohibits disclosure." *Id.* The USDA has promulgated regulations regarding discretionary release:

Except where disclosure is specifically prohibited by Executive Order, statute, or applicable regulations, an agency [of USDA] may release records exempt from mandatory disclosure under 5 U.S.C. § 552(b) whenever it determines that such disclosure would be in the public interest. Such a record is considered to be in the public interest if the benefit to the public in releasing the document outweighs any harm likely to result from disclosure.

*Family Farms*, 200 F.3d at 1185, citing 7 C.F.R. § 1.17(b).[2] The Court, therefore, must review the administrative record to determine whether the agency's decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Family Farms*, 200 F.3d at 1187, citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

*C. FOIA.* "The Freedom of Information Act was enacted to facilitate public access to Government documents." *U.S. Dept. of State v. Ray*, 502 U.S. 164, 173, 112 S.Ct. 541, 116 L.Ed.2d 526 (1991).

The statute was designed " 'to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny.' " Consistently with this purpose, as well as the plain language of the Act, the strong presumption in favor of disclosure places the burden on the agency to justify the withholding of any requested documents. That burden remains with the agency when it seeks to justify the redaction of identifying information in a particular document as well

---

**2.** Since the filing of this suit, § 1.17(b) was amended, effective July 28, 2000. The amended regulation is found at 7 C.F.R. § 1.19, which provides as follows:

(a) All agency records, except those specifically exempted from mandatory disclosure by one or more provisions of 5 U.S.C. 552(b), shall be made promptly available to

any person submitting a request under this subpart.

(b) Agencies are authorized, in their sole discretion, to make discretionary releases when such release is not otherwise specifically prohibited by Executive Order, statute, or regulation.

748

as when it seeks to withhold an entire document.

The redaction procedure is, however, expressly authorized by FOIA. Congress thus recognized that the policy of informing the public about the operation of its Government can be adequately served in some cases without unnecessarily compromising individual interests in privacy.

*Ray,* 502 U.S. at 173–74, 112 S.Ct. 541. While disclosure rather than secrecy is the primary objective of FOIA, there are a number of exemptions which excuse an agency from its requirements. *U.S. Dept. of Defense v. Fed. Labor Relations Authority,* 510 U.S. 487, 494, 114 S.Ct. 1006, 127 L.Ed.2d 325 (1994). One such is Exemption 6, "which provides that FOIA's disclosure requirements do not apply to 'personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy.'" *Id.* at 494–95, 114 S.Ct. 1006, citing 5 U.S.C. § 552(b)(6). Unless the invasion of privacy is "clearly unwarranted," "the public interest in disclosure must prevail." *Ray,* 502 U.S. at 177, 112 S.Ct. 541. The threshold inquiry in a case involving Exemption 6 is whether the requested information includes "files," which the Supreme Court has interpreted broadly "to include any 'information which applies to a particular individual.'" *Sherman v. U.S. Dept. of the Army,* 244 F.3d 357, 361 (5th Cir.2001).

When evaluating the propriety of disclosure, the reviewing official cannot base its decision on the reasons behind the request for information. *Dept. of Defense,* 510 U.S. at 496, 114 S.Ct. 1006. The identity of the requesting party and his motives have no bearing on the request because "Congress 'clearly intended' the FOIA 'to give any member of the public as much right to disclosure as one with a special interest.'" *Id.*

In evaluating whether an exemption is applicable, the Court must balance public interest in disclosure against whatever interest Congress intended for the exemption to protect. *Dept. of Defense,* 510 U.S. at 495, 114 S.Ct. 1006. The only relevant public interest in disclosure "is the extent to which disclosure would serve the 'core purpose of the FOIA,' which is 'contribut[ing] significantly to public understanding of the operations or activities of the government.'" *Id.* at 495, 114 S.Ct. 1006, citing *U.S. Dept. of Justice v. Reporters Comm. for Freedom of Press,* 489 U.S. 749, 755, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989). The focus should be on whether the information sought would "'she[d] light on an agency's performance of its statutory duties' or otherwise let citizens know 'what their government is up to.'" *Bibles v. Oregon Natural Desert Assn.,* 519 U.S. 355, 356, 117 S.Ct. 795, 136 L.Ed.2d 825 (1997). However, that purpose "is not fostered by disclosure of information about private citizens that is accumulated in various governmental files but that reveals little or nothing about an agency's own conduct." *Id.,* citing *Reporters Comm.,* 489 U.S. at 773, 109 S.Ct. 1468. "FOIA's central purpose is to ensure that the Government's activities be opened to the sharp eye of public scrutiny, not that information about private citizens that happens to be in the warehouse of the Government be so disclosed." *Reporters Comm.,* 489 U.S. at 774, 109 S.Ct. 1468.

The Supreme Court has consistently recognized the high weight to be placed on the potential disclosure of personal information of private citizens. *Bibles,* 519 U.S. 355, 117 S.Ct. 795, 136 L.Ed.2d 825 (protecting names of addresses of individuals receiving Bureau of Land Management newsletter); *Dept. of Defense,* 510 U.S. 487, 114 S.Ct. 1006, 127 L.Ed.2d 325(protecting home addresses of agency

employees represented by unions); *Ray,* 502 U.S. 164, 112 S.Ct. 541, 116 L.Ed.2d 526 (protecting statements from deportees which included identifying information); *Reporters Comm.,* 489 U.S. at 774–775, 109 S.Ct. 1468 ("Thus, it should come as no surprise that in none of our cases construing the FOIA have we found it appropriate to order a Government agency to honor a FOIA request for information about a particular private citizen") (protecting criminal records). The Court has been understandably reluctant to "disparage the privacy of the home, which is accorded special consideration in our Constitution, laws, and traditions." *Dept. of Defense,* 510 U.S. at 501, 114 S.Ct. 1006. "An individual's interest in controlling the dissemination of information regarding personal matters does not dissolve simply because that information may be available to the public in some form." *Id.,* at 500, 114 S.Ct. 1006.

There is no question but that the information contained in the records sought by API and FG would constitute personally identifying data that would not be disclosable if it were obtained from an individual. In the present case, it appears that the government determined that Exemption 6 was not applicable because the Cooperators were "businesses" and had submitted the identifying information to WS in their "business" capacity. As such, disclosure of identifying information would not interfere with the privacy rights of an "individual." This determination was clearly not warranted by the information contained in the records reviewed by the OGC and is, therefore, an abuse of discretion. As the Eighth Circuit noted, "An overly technical distinction between individuals acting in a purely private capacity and those acting in an entrepreneurial capacity fails to serve

the exemption's purpose of protecting the privacy of individuals." *Campaign for Family Farms,* 200 F.3d at 1189.

The government's position appears to arise out of the Cohen memo.[3] This position is untenable because it is based upon information that is not even contained on the documents and forms completed in reference to a Cooperative Agreement. WS does not require that a Cooperator indicate, on a Cooperative Agreement or otherwise, whether it is requesting assistance as a business entity or as a private individual. Nor does the fact that an entry on a Cooperative Agreement identifies a ranch name or farm name mean that activities being conducted at the property are done by a business or to reap financial profit. The property could very well be owned by an individual as a private residence or for recreational pursuits. Also, the name that someone attaches to a farm or ranch can be arbitrary and does not necessarily have any bearing on whether the property is used for a business. Additionally, although many Cooperators live on the property where they ranch or farm, it is impossible to tell with certainty merely by looking at a Cooperative Agreement whether the address listed is a residence or not. In those cases where a Cooperator does reside on a farm or ranch property, WS may be conducting activities on that property which are unrelated to farm or ranch work, such as protecting family members, their private property, or perhaps their garden. Finally, in some cases, a Cooperator may not even be the person whose resources are threatened by wildlife. For example, coyotes living on a neighbor's property may be killing a landowner's cattle or sheep. In order the address the landowner's problem, WS must access the neighbor's property.

---

**3.** The cases relied upon in the Cohen memo do not support his interpretation and are readily distinguishable.

One other distinction suggested by the OGC, as previously noted, was that APHIS "make the call" on whether a ranch is a business or not based · on the amount of resources (livestock) to be protected. OGC instructed that, for example, if there are 100 head of cattle to be protected, people were not maintaining the cattle as pets. The cattle were, therefore, a business resource and such Cooperators should be identified as a business. Plaintiff's X 2, pp. 65–66.[4] This interpretation has no factual or legal basis and has been used by the agency only with the present suit and the New Mexico FG suit.

█ The Court will assume for the purposes of argument that USDA regulations define "business" as something other than a business entity (such as a corporation, partnership, joint venture, etc.) recognized at law.[5] The government has not, however, pointed to any USDA regulation which defines a "business" in regard to the size of its inventory or which creates a presumption that one who owns more than 100 head of livestock is a "business." It is also specious to assume that because a Cooperator's ranch has been given a name it somehow becomes a business. It surely will come as a surprise to a number of suburban home owners that their homestead has magically turned into a "business" because they happened to give it a name. Obviously the government's definition of "business" for these purposes is something that has been created out of thin air and has no factual or rational basis. The decision maker completely ignored the previous policy of the USDA in regard to non-disclosure of this information and the subsequent readoption of that earlier policy. Therefore, the USDA's decision that the Cooperators were not entitled to individual privacy rights under Exemption 6 was arbitrary, capricious, an abuse of discretion, and not in accordance with law.

As the government did not recognize an individual right under Exemption 6, it obviously did not attempt to balance the Cooperators' right to privacy and the public's right to the information requested. In this regard, the "motives" identified for discovery of the information by both the Plaintiffs and the animal rights groups are irrelevant—the focus is on whether the public is entitled to the information, not whether the requester has an evil or noble purpose. The question is, Does the requested information shed any greater light on the operations of the USDA, APHIS or the WS? The answer is, No. Information regarding the particulars of the LPC program have been provided. The Intervenor's argument that the public has a right to know where LPC collars are located so they don't inadvertently encounter them is insufficient. The LPC collars are not placed on public land, and a member of the public would encounter one only if s/he were trespassing on private property.[6]

---

4. The government has submitted affidavits that identify several other bases for its determination. However, the Court's analysis under the APA, which the government advocates, is limited to the administrative record. The government's after-the-fact attempt to bolster its decision is irrelevant.

5. The cases cited by the government do not support their position. Both *Sims v. C.I.A.*, 642 F.2d 562, 572 n. 47 (C.A.D.C.1980) and *National Parks & Conservation Ass'n v.*

*Kleppe*, 547 F.2d 673, 685 n. 44 (D.C.Cir. 1976), indicate only that institutions, corporations and other formal business organizations lack personal privacy rights. That is because a business organization is a person only by legal fiction. It is not an individual with Constitutionally protected rights. *See United States v. Morton Salt Co.*, 338 U.S. 632, 651–652, 70 S.Ct. 357, 94 L.Ed. 401 (1950).

6. The converse of API's argument could be made, particularly in light of September 11.

The information that is provided by WS sheds sufficient light on the agency's workings, including the following: WS directives; WS factsheets; annual highlight reports; annual highlight tables which include expenditures, the number of WS employees, animals taken, animals freed, pesticides used, pesticides sold, equipment loaned, endangered species work performed and loss data; the number of Cooperators by state; and WS office directories. WS additionally provides a website with links to WS publications and a viewable public service announcement. No personally identifying information related to the Cooperators could shed any further light on the workings of the WS.

Finally, there is no basis for an argument that the agency still had the discretion to release the information under FOIA. As previously noted, 7 C.F.R. § 1.17(b) prohibited the agency from releasing otherwise exempt material except when disclosure would be in the public interest. This balancing test is almost exactly the same as the Exemption 6 test. *Family Farms*, 200 F.3d at 1185. The agency did not perform a balancing test under either regulation. Accordingly, the Plaintiffs' Motion for Partial Summary Judgment as to its claim under Exemption 6 will be granted.

*D. Exemption 3.* Plaintiffs additionally assert that Exemption 3 of FOIA precludes disclosure of the Cooperators' personal identifying information. 5 U.S.C. § 552(b)(3). Exemption 3 exempts from disclosure information specifically protected by another federal statute, provided that the statute (1) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (2) establishes particular criteria for withholding or refers to particular types of matters to be withheld. The stat-ute identified by Plaintiffs as prohibiting disclosure is the Federal Insecticide, Fungicide and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136i-1(b). Section 136i mandates that the Secretary of the USDA require certified applicators of restricted use pesticides to maintain certain application records. 7 U.S.C. § 136i-1(a)(1). Such records are available to other agencies dealing with pesticide use, but the statute provides that "in no case may a government agency release data, including the location from which the data was derived, that would directly or indirectly reveal the identity of individual producers." *Id.;* 7C.F.R. § 110.3(g). That this statute is meant to protect farmers is clear from the Congressional record. One proposed amendment which would have protected only the "name and address of the individual maintaining the records[,]" was rejected because it did not adequately protect the privacy of farmers. 136 Cong. Rec. S10902–03, *S10933, 1990 WL 148272 (July 20, 1990) (statement of Sen. Grassley). Allowing access to such records by persons other than Federal and State officials would have "left farmers open to attacks, harassment, frivolous litigation, and overall mischief by activist groups." *Id.*

■ As previously noted, the pesticides contained in the LPC's and M–44's are classified as restricted use pesticides, and the application of such pesticides by WS personnel triggers the recordkeeping requirements. USDA personnel have noted that WS personnel who apply restricted use pesticides on Cooperator property are subject to recordkeeping requirements made applicable for FIFRA and USDA regulations, codified at 7 C.F.R. Part 110. Plaintiffs' Exhibit 23. As a result, the release of the information sought by API

---

Pinpointing the geographic location of such dangerous chemicals could provide terrorists with another tool to use against innocent citizens.

and FG in this case would be in violation of FIFRA and would fall under Exemption 3.

*E. The Privacy Act.* The Privacy Act generally precludes disclosure of personal information and provides, in pertinent part:

No agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless disclosure of the record would be ... (2) required under section 552 of this title [FOIA].

*Dept. of Defense,* 510 U.S. at 494, 114 S.Ct. 1006, citing 5 U.S.C. § 552a(b)(2). Disclosure is prohibited unless FOIA requires release. As already noted, FOIA does not require release of the information sought by API and FG. Additionally, none of the Cooperators whose records are at issue have given consent for those records to be released.

■■ The purpose of the statute is to protect individuals against invasions of their personal privacy by preventing the potential misuse of personally identifiable information stored in computers. *Johnson v. Dept. of Treasury,* 700 F.2d 971, 976 (5th Cir.1983); S.Rep. No. 1183, 93d Cong., 2d Sess. 1–2 (1974). Thus, where there is evidence that an agency maintains records from which there have been "even a few" retrievals of information keyed to individuals' personal identifiers, a system of records exists. *See e.g., Alexander v. F.B.I.,* 193 F.R.D. 1, 6–7 (D.D.C. March 29, 2000) (Lamberth, J.), quoting *Henke v. U.S. Dept. of Commerce,* 83 F.3d 1453, 1461 (D.C.Cir.1996); *Bettersworth v. FDIC,* 248 F.3d 386, 392 (5th Cir. April 12, 2001) (records are in system of records if they are retrievable by an identifying particular assigned to an individual); *Smiertka v. U.S. Dept. of Treasury,* 447 F.Supp.

221, 228 (D.D.C.1978) (records avoid classification as within system of records only if they are "never" retrieved except by personal identifier), *rem. other grounds,* 604 F.2d 698 (D.C.Cir.1979).

■ The argument that the Government offers in this regard is that the records in this case are not maintained in such a manner that information may be retrieved by personal identifiers such as a Cooperator's name, address or other identifying bits of information. The record in this case reflects that the files at issue in this case can be retrieved by use of personally identifying information. Defendant's X 11 and X 12. Personal Cooperator information is entered into the MIS from Cooperative Agreements, and personal information can be retrieved by personal identifiers. The MIS is the single data repository from which more than 200 different types of reports are generated. Blaney Decl. No report is kept separately and independently. All reports are generated from the same source; namely, the raw data entered into the MIS. Reports vary only in that selective bits of information are combined differently for different reports. As such, the Cooperator Information sought by API and FG fall within the ambit of the Privacy Act. In light of the foregoing, it is

**ORDERED** that the Federal Defendants' Motion to Dismiss is GRANTED as Plaintiffs' claims in this regard seek relief beyond the jurisdiction of this Court. It is further

**ORDERED** that Plaintiffs' Motion for Partial Summary Judgment is partially **GRANTED**, except as to their substantive due process claim which has been dismissed. It is further

**ORDERED** that the Federal Defendants' Motion for Summary Judgment is **DENIED**. As all claims have been resolved, the Court will issue a Judgment that declares that the Defendants' actions

in attempting to release personal identifying information is a violation of FOIA and the Privacy Act and that any further attempt to release such information is enjoined. The parties' shall submit a proposed Judgment within ten (10) days from entry of this Memorandum Opinion and Order which outlines the proper parameters for such declaratory and injunctive relief not inconsistent with this Order.